**CONTINENTAL PRODUCTS CO. v. UNITED STATES.**
**No. H–21.**

Court of Claims.
Oct. 20, 1930.

William R. Brown, of Chicago, Ill. (James D. Cooney, of Chicago, Ill., on the brief), for plaintiff.

Isidore Graff, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen. (R. C. Williamson and Ottamar Hamele, both of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

The plaintiff in this case seeks to recover $300,964.08, with interest, which it claims to be due it as a refund upon taxes paid for the year 1917.

The contention of the plaintiff is that during that year it was affiliated with another corporation, the Brazil Railway Company, and it is conceded that if it was so affiliated within the meaning of the revenue laws, it is entitled to the refund. The defendant disputes this affiliation, which constitutes the sole issue in the case.

There is no dispute as to the facts, although there is much contention as to what deductions may be drawn from them. The Brazil Railway Company, with which the plaintiff claims to be affiliated, was incorporated in 1906, and issued for property and cash, stock to the amount of $52,000,000. As its name would indicate, it was engaged in the railway business in Brazil for the purpose of constructing and operating railways and developing the territory traversed thereby. The Sorocabana Railway Company and the Uruguay Railway Company were organized for the purpose of constructing and operating railways in Brazil and Uruguay, and all or nearly all the stock of these companies was issued to and owned by the Brazil Railway Company. Several other companies were organized for the purpose of developing the territory tributary to the railway lines of the companies above mentioned as subsidiaries either to the Brazil Railway Company or one of the subsidiary railway companies above mentioned.

On September 21, 1911, the Brazil Railway Company caused the organization of the Brazil Land, Cattle & Packing Company with very extensive powers, but with the particular purpose of acquiring land, cattle, and swine, and improving the breed of the cattle, and developing the cattle business in the territory tributary to the railways. Another purpose for which this cattle company was

organized was the construction and operation of a packing plant. To carry out this purpose a contract was made with G. F. Sulzberger, which was subsequently assigned to the Sulzberger Products Company, a corporation organized solely for the purpose of constructing and managing the proposed packing plant. It provided for the organization of a new company for that purpose, and in pursuance of the agreement the plaintiff was organized on December 23, 1912. The Brazil Land, Cattle & Packing Company acquired 77½ per cent. of the issued common stock of the plaintiff and the Sulzberger Products Company acquired the remaining 22½ per cent. The capital stock of the Sulzberger Products Company was owned by Sulzberger & Sons Company, which had for many years operated in Europe and the United States the business of selling meats and other packing-house products at wholesale. A contract for the construction and management of the packing house was entered into between plaintiff and the Sulzberger Products Company which, among other things, provided that the Sulzberger Products Company should manage the construction and operation of the packing plant of plaintiff and should decide what policies should be pursued in the conduct of plaintiff's business; also, that the Sulzberger Products Company should be vested with the absolute management and control of the business of the plaintiff without the right or power of interference or restriction by the board of directors of the plaintiff. The contract further provided that the term of the agreement should be for twenty years and for the first ten years thereof the plaintiff should pay the Sulzberger Products Company for its services $60,000 a year, and thereafter such a sum as should be fixed by agreement; otherwise the powers of the directors, stockholders, and officers of the plaintiff were not modified.

The law applicable to the case is found in section 1331 of the Revenue Act of 1921 (26 USCA § 1067(b)(1), providing for the construction of the Revenue Act of 1917 with reference to the corporations that are affiliated and the imposition of taxes on the basis of consolidated returns of net income and invested capital. This section provides that a corporation or partnership is affiliated with other corporations or partnerships—

"(1) when such corporation or partnership owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others." Section 1331(b)(1).

It will be observed that the Brazil Railway Company, with which the plaintiff claims to be affiliated, owned no stock in the plaintiff company. It did, however, own all the stock of the Brazil Land Cattle & Packing Company, which company owned 77½ per cent. of the stock of the plaintiff company. If it controlled the remainder "through closely affiliated interests or by a nominee or nominees," this would come within the provision above quoted and the companies would be deemed to be affiliated. It is argued that plaintiff controlled the remaining stock which was held by the Sulzberger Products Company because that company was an employee of the plaintiff, and by reason of this fact plaintiff controlled the stock held by the Sulzberger Products Company, which was organized solely for the purpose of carrying on plaintiff's business.

The courts have held in some cases where an employee holds stock and his position is such that the company which employs him virtually controls his action with reference to the stock that this is such control as is referred to by the statute. But this is as far as any of the cases go, and we think that if the holder of the stock occupied such a position as to make him entirely independent of the party who claimed control thereof it cannot be properly held that such stockholders come within the provisions of the statute quoted. In the instant case the evidence not only fails to show that the Sulzberger Products Company, which owned the minority stock, occupied such a position, but it negatives such a claim and declares to the contrary. The Sulzberger Products Company had absolute and complete control over the business of the plaintiff under the terms of the management contract. The plaintiff had absolutely nothing to say as to how the business was to be carried on. The Sulzberger Products Company could even borrow money to carry on the business without interference from the plaintiff. This was no ordinary contract of employment in which the employer had direction of the work of the employee. On the contrary, the employee had the direction and control of everything in relation to the business. If the situation had been reversed, the Sulzberger Products Company holding 77½ per cent. of the stock, and a contract was entered into with the minority stockholder giving the majority stockholder the absolute control of the business, we could readily say that the two companies were af-

filiated; but there was nothing of the kind shown in the case, and if there was it would not help plaintiff's case. The fact that the Sulzberger Products Company, although only the minority stockholder in the company which is plaintiff herein, controlled the policies of that company, might show that these two companies were affiliated; but in order to enable plaintiff to recover herein, the affiliation must be between the plaintiff and the Brazil Railway Company.

It is urged on behalf of plaintiff that the control referred to in the statute is control of the stock and not control of the business. But what is the stock issued for? One of the main purposes is to give the stockholders the control of the business and the policies of the corporation, and where the stockholders can do nothing but approve the acts of the party to whom the management of the business and the control of its policies have been delegated, for all practical purposes they have parted with the control of the stock. In Isse Koch & Co., 1 B. T. A. 624, 627, it is said:

"There is no authority in the section of law referred to or in its context, so far as we can see, for assuming that Congress intended to use the word 'control' in other than its ordinary and accepted sense."

All that the stockholders of the Continental Products Company could do was to either ratify the acts of the Sulzberger Products Company in carrying on the business of the plaintiff or to refuse to comply with the contract between the two corporations, in which event the whole business would have come to an end. Plaintiff and its stockholders did not refuse to conform to the contract, but, on the contrary, accepted it and control by the Sulzberger Products Company.

Even if it should be held that the control of the Sulzberger Products Company over the management of the affairs of plaintiff did not in effect give the Sulzberger Products Company control of the majority stock, it would still be clear that the provision with reference to management gave plaintiff no control over the stock owned by the Sulzberger Products Company. That company was free from domination by the Brazil Railway Company or any of its affiliated interests and could therefore vote or use its stock in any way that it wished, subject to the restrictions hereinafter mentioned.

Counsel for plaintiff urge in support of their contention that the Brazil Railway Company controlled the minority stock of the plaintiff company, that the contract between the Sulzberger Products Company, and the plaintiff provided that neither could sell its stock without the consent of the other. As before stated, it is conceded that the Brazil Railway Company was affiliated with the Brazil Land, Cattle & Packing Company, which owned the majority of the stock in the plaintiff company and as a matter of course controlled the stock that it owned. The argument therefore is in effect that because of this restriction on the sale of the stock, the majority interests controlled the stock held by the minority. The flaw in this argument arises from the fact that the restriction on the sale of stock was mutual, and provided that neither should dispose of its stock for the period of twenty years. The minority stockholders had the same control over the stock held by the majority as the majority had over that held by the minority. Moreover, the situation is very different from one in which the majority stockholders have the right to purchase the stock of the minority or even that where the minority cannot sell to any one except the majority. In these situations there is evidence of control, but in the instant case the restriction which the contract provided, rather than showing a common or a controlling interest, appears to us to show that the interests were adverse. In other words, the provision was inserted evidently for the purpose of enabling one party to prevent the other from selling out its stock to an undesirable associate, and each had the same "control" in this respect.

The same principle applies to the restriction on the payment of dividends. The by-laws of the plaintiff required the consent of four-fifths of the stockholders in order that a dividend might be declared. The majority stockholders did not own four-fifths, so that it might be claimed that this provision strengthened the control which the minority stockholders had over the management of the company. However this may be, the restriction was mutual and each acquired thereby the same "control" over the stock of the other.

Subdivision (1) of subsection (b) of section 1331 of the Revenue Act of 1921, already quoted, provides that affiliation may be established when all of the stock of the corporation as to which it is claimed to exist is controlled by a nominee or nominees of the other. In order to bring itself within this provision, plaintiff must show by the evidence that substantially all the stock was controlled by a nominee of the Brazil Land, Cattle & Packing Company. The evidence does show

that Rodney D. Chipp, who was treasurer of the Brazil Land, Cattle & Packing Company in 1917, at the meetings of the directors of plaintiff company, held proxies from the Sulzberger Products Company to vote all of its stock. The question of whether the receipt of these proxies and the use made thereof showed control of the stock belonging to the Sulzberger Products Company is discussed at length in argument of counsel, but we do not need to pass upon the question thus raised. Rodney D. Chipp was also the secretary and treasurer of the plaintiff. There is nothing in the evidence to show that he was nominated or in any way selected by either the plaintiff or the Brazil Land, Cattle & Packing Company to obtain and vote the proxies which he received. If we were to speculate upon the probabilities, it would seem more likely that he was selected by the plaintiff for that purpose in order that its directors, who represented all of its stockholders, should have a voice in determining who should vote at the stockholders' meetings. In any event, he was as much the nominee of the Sulzberger Products Company as of the Brazil Land, Cattle & Packing Company. But however this may be, there is no evidence that he was named for this purpose by the last-named company, and the provisions of the statute last under discussion can not avail the plaintiff.

It should be noted in this connection that the giving of a proxy at most makes the proxyholder only an agent of the donor. The Board of Tax Appeals said in Tunnel Railroad of St. Louis, 4 B. T. A. 596, that proxies are to be construed as granting the power to vote stock in the ordinary concerns of corporations, unless their terms are special, and are no authority to vote for the reorganization of the corporation, its consolidation with another corporation, or the sale of all of its property, or a voluntary liquidation of its affairs. We think this is the correct rule. Applying it to the situation in the case at bar, we find that the granting of proxies to vote the stock of plaintiff gave little if any more authority than to confirm the acts of the Sulzberger Products Company in the management of plaintiff's affairs. Clearly all the important matters of control were left in the hands of the Sulzberger Products Company by the contract between it and the plaintiff.

Under provisions of the statute in addition to those which we have already quoted, in order to make out a case of affiliation, it must also be established either that the corporations alleged to be affiliated were engaged in the same or a closely related business, or one corporation bought from or sold to the other products or services at prices above or below the current market, thus effecting an artificial distribution of profits; or one corporation so arranged its financial relationships with the other as to assign to it a disproportionate share of net income or invested capital. These requirements, it will be observed are in addition to the requirement of a showing that substantially all of the stock is controlled by another corporation or closely affiliated interests, and it is only necessary to determine whether they have been complied with in event it should be found that such control was established by the evidence. If this should be found (contrary to the conclusion which we have reached above), then it will be necessary to determine whether any one of these additional requirements has been established by the evidence.

When we consider whether the corporations were engaged in the same or a closely related business, there would seem to be no doubt that they were not. This provision, in our judgment, refers to the two companies that are to be considered as affiliated. In the instant case these companies are the Brazil Railway Company and the plaintiff. We do not think any one would claim that the business of the railway company and that of the plaintiff, which was carrying on a packing plant, were the same or even closely related. The attorneys for plaintiff seem to consider that under this provision of the statute the business of the plaintiff can be compared with any company which was affiliated with the Brazil Railway Company, but we do not think that this is a proper construction of the language used in the law. As we construe the statute, the comparison can only be properly made between the two companies which it is sought to prove are affiliated.

Some argument is made based upon the claim that the plaintiff and the other corporations had an interlocking directorate. Thomas E. Wilson was one of the directors of plaintiff and also of the Sulzberger Products Company in the year 1917. The other four directors of the Sulzberger Products Company did not belong to the directorate of any of the other companies. It is quite clear that there was no interlocking directorate between the Sulzberger Products Company and the plaintiff or any of the companies with which it was affiliated.

The plaintiff claims that it purchased cat-

tle from the Brazil Land, Cattle & Packing Company at arbitrary prices and that upon the sale of the meats a division of the profits was made.

The cattle purchased by the plaintiff from the Brazil Land, Cattle & Packing Company were bought pursuant to a contract under which the plaintiff agreed to pay 7 cents or 8½ cents per aroba upon delivery of the cattle, and when the meat was sold the cattle company was to receive 3 cents additional per aroba, and anything remaining was to be divided equally between the plaintiff and the Brazil Land, Cattle & Packing Company. There is no evidence as to what the market price of the cattle was at the time and nothing to show whether in the final settlement the cattle company received more or less than it might at ordinary prices. In other words, it does not appear that the price was arbitrary or an unreasonable one, nor was there anything unusual about the contract.

Some claim is made that the expenses of the New York office were arbitrarily apportioned between the plaintiff and the other companies, but there is nothing in the evidence to sustain this claim.

It is also contended that the Brazil Railway Company or its affiliated companies assigned to plaintiff a disproportionate share of invested capital. Counsel for plaintiff state:

"Notwithstanding the cattle company having no paid-in invested capital, it subscribed and paid $1,162,500 in cash for 11,625 shares of stock of the Continental Products Company; thus so arranging the artificial relationship between these corporations as to assign to the Continental Products Company a disproportion of the invested capital."

Whatever these facts may indicate as between the Brazil Railway Company and the Brazil Land, Cattle & Packing Company, they utterly fail to show that the plaintiff was assigned a disproportionate share of invested capital. In fact, there is no showing whatever as to how much invested capital plaintiff needed, except that there is evidence that the packing plant cost $1,153,784.98 and that plaintiff bought 300 acres of land from the cattle company. The capital stock of the plaintiff was subscribed and issued for cash. Obviously it needed a capital in excess of the cost of its packing plant for operating purposes. The evidence does not disclose how much this would be, nor is there anything to indicate that the total amount of its capital was in excess of its actual needs for carrying on the business.

Counsel for plaintiff have cited some sixty cases which it is claimed support their contentions. The reasonable limits of an opinion forbid the review of the decisions therein. All of these cases have been examined with care, and when the facts which were shown therein are taken into consideration we think there is nothing which conflicts with this opinion and much that tends to sustain it.

It follows from what has been stated above that the plaintiff and the Brazil Railway Company cannot be considered under the law as affiliated corporations, and that plaintiff's petition must be dismissed. It is so ordered.